David C. Wakefield, Esq.    Bar #: 185736
Law Offices of David C. Wakefield
10620 Treena Street, Suite 230
San Diego, CA 92131
Telephone:  619.241.7112; Facsimile:  619.342.7755
E-mail:     dcw@DMWakeLaw.com
            dcwlawoffice@gmail.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED AFRICAN-ASIAN ABILITIES CLUB**<br><br>                    **Plaintiffs,**<br><br>       **v.**<br><br><br>**IMT CAPITAL II BEVERLY ARNAZ LLC; AND DOES 1 THROUGH 10, Inclusive**<br><br>                    **Defendants.** | **Case No.:**<br><br>**COMPLAINT**<br><br>**DISCRIMINATORY PRACTICES**<br>**[Fair Housing Act Amendments of 1988, 42 U.S.C. 1988, Et. Seq; Government Code 12925**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This case involves access to housing under the Fair Housing Act Amendments of 1988. The Act prohibits discrimination based on disability. There are different forms of discrimination under the Act.   Organizational standing is separate from the standing of the organization's members, turning instead on "whether the organization itself has suffered an injury in fact." *Smith v. Pacific Properties and Development Corp.,* 358 F.3d 1097, 1101 (9th Cir.2004) (citing *Havens Realty Corp. v. Coleman,*

455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). Section 3602(d) of the FHA defines a "person" who may sue under the Act to include "corporations" and "associations." 42 U.S.C. § 3602(d) (1988). As non-profit corporations, plaintiffs are "persons" protected by the statute. *See Havens,* 455 U.S. at 378–79 & n. 19, 102 S.Ct. 1114; *Walker v. City of Lakewood,* 272 F.3d 1114, 1123, n. 1 (9th Cir.2001). Plaintiffs must therefore satisfy the requirement for individual standing: "a demonstration of concrete and particularized injury giving." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Havens,* 455 U.S. at 378–79, 102 S.Ct. 1114. In *Pacific Properties,* the Ninth Circuit reaffirmed its holding in *Fair Housing of Marin v. Combs,* 285 F.3d 899, 905 (9th Cir.2002) that an organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question. *Pacific Properties,* 358 F.3d at 1101 (citing *Fair Housing,* 285 F.3d at 905). Testers have played a long and important role in fair housing enforcement, stemming from the Supreme Court's three-decade-old determination that with the Fair Housing Act, Congress intended to establish a broad set of rights to be free from housing discrimination, and that as a general rule, courts should not erect standing barriers— other than the minima required by Article III—to those seeking to vindicate these rights. *See Havens,* 455 U.S. at 372–73, 102 S.Ct. 1114; *see also Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). The high court more recently cautioned that courts be no less generous in interpreting provisions added to the Fair Housing Act by the Fair Housing Act. *See City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 731, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995).

2.      Here, Plaintiff-UNITED AFRICAN-ASIAN ABILITIES CLUB (hereinafter

2

referred to as UAAAC, Club or Association) is an organization that advocates on the behalf of its members with disabilities when their civil rights and liberties have been violated.  Members of that organization include members that have disabilities that relate to the service, policy, programs and physical accessibility barriers at the property; those disabilities include, but are not limited to, sight, mobility disabilities and hearing disabilities.  Plaintiff-UNITED AFRICAN-ASIAN ABILITIES CLUB has members who have been deterred from accessing Defendant's facilities and services.  The Club or Association is an international group started in 2011. One of its core missions is to reduce charitable or public assistance dependence by people with mental and physical conditions by promoting business and employment opportunities. Another critical mission of the Club is to provide written testimony concerning proposed laws related to people with conditions. Further, another core mission of Plaintiff Association is to provide counseling and referral housing services to minorities with sight, mental, hearing and physical conditions. Achieving this mission is frustrated by the rampant violations of the fair housing laws. In fact, the Association started its mission in 2011. It is futile for the most part. Another core mission of Association is searching for accessible businesses and giving awards to them. These businesses include apartments. As alleged with specificity herein, Plaintiffs had to divert time and resources to investigate Defendants. As in Smith, 358 F.3d 1105, a further mission of the group is to eliminate disability discrimination. These missions are not abstract social interests of the Club. Without access to housing people with disabilities cannot live alone. Plaintiff United African-Asian Abilities Club members have associational standing to maintain this action. The U.S. Supreme Court has set out three requirements for an associational plaintiff to have standing under U.S. Const. art. III to sue on behalf of its members: (1) its members must have standing to sue on their own.  The United African-Asian

3

Abilities Club's members have mobility, hearing, sight and other disabilities covered by the Fair Housing Act; (2) the interests he/she seeks to protect must be germane to the organization's missions.  The missions of United African – Asian Abilities Club are stated above; and (3) neither the claim asserted nor the relief requested may require the participation of individual members in the lawsuit, the United African – Asian Abilities Club is only seeking organizational damages[1] and injunctive relief and not seeking to recover damages for the individual members. Such associational standing requires that at least some members would have standing to sue in their own right.  The first two factors are required by the Constitution and the third is a judicially self-imposed limit on the exercise of federal jurisdiction that Congress may remove by statute.  In determining whether UAAAC has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual: Has the plaintiff " 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction"? *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S., at 261, 97 S.Ct., at 561 (emphasis omitted), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). There can be no question that the Club has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests, see *Sierra Club v. Morton*, 405 U.S., at 739, 92 S.Ct., at 1368. Therefore, Plaintiffs make the following allegations in this civil rights action.

[1]

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)

4

## JURISDICTION AND VENUE

3.      Defendants' property that is the subject of this action is located in Los Angeles County.

4.      The federal jurisdiction of this action is based on the 42 U.S.C. 3604 - the Fair Housing Act Amendments of 1988.  Venue in the Judicial District of the United States District Court of the Central District of California is in accordance with 28 U.S.C. § 1391(b) because a substantial part of Plaintiffs' claims arose within the Judicial District of the United States District Court of the Central District of California.

## SUPPLEMENTAL JURISDICTION

5.      The Judicial District of the United States District Court of the Central District of California has supplemental jurisdiction over the state claims as alleged in this Complaint pursuant to 28 U.S.C. § 1367(a).  The reason supplemental jurisdiction is proper in this action is because all the causes of action or claims derived from federal law and those arising under state law, as herein alleged, arose from common nucleus of operative facts.  The common nucleus of operative facts, include, but are not limited to, the incidents where Plaintiffs and at least one association member were denied full and equal access to Defendants' goods, and/or services in violation of both federal and state laws when he attempted to enter, use, and/or exit Defendants' services as described within this Complaint below.  Further, due to this denial of full and equal access, Plaintiffs and other individuals with disabilities were injured.  Based upon said allegations, the California causes of actions, as stated herein, are so related to the Federal claims that they form part of the same case or controversy, and the actions would ordinarily be expected to be tried in one judicial proceeding.

5

COMPLAINT
CASE #

**NAMED DEFENDANTS AND NAMED PLAINTIFFS**

6.      The term Plaintiffs as used herein specifically include United African-Asian Abilities Club and at least one association member.

7.      Defendants are, and, at all times mentioned herein, were, a business or corporation or franchise organized and existing and/or doing business under the laws of the State of California.    Plaintiff Association is informed and believes and thereon alleges that IMT CAPITAL II BEVERLY ARNAZ LLC is the operator of the business known as IMT Beverly Arnaz Apartments located at 467 Arnaz Drive, Los Angeles, California 90048.  Plaintiff Association is informed and believes and thereon alleges that Defendant IMT CAPITAL II BEVERLY ARNAZ LLC is the owner, operator, and/or lessor of the real property located at 467 Arnaz Drive, Los Angeles, California 90048.

8.      Defendants Does 1 through 10, were at all times relevant herein subsidiaries, employers, employees, and/or agents of IMT CAPITAL II BEVERLY ARNAZ LLC. Plaintiff Association is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff Association will pray leave of the court to amend this complaint to allege the true names and capacities of the Does when ascertained.

9.      Plaintiffs, including Plaintiff Association, are informed, believe and thereon allege, that Defendants and each of them herein were, at all times relevant to the action, the owner, lessor, lessee, franchiser, franchisee, general partner, limited partner, agent, employee, representing partner, or joint venturer of the remaining Defendants and were acting within the course and scope of that relationship. Plaintiffs, including Plaintiff Association are further informed and believe, and thereon allege, that each of the Defendants herein gave consent to, ratified, and/or authorized the acts alleged herein to each of the remaining Defendants.

6

**CONCISE SET OF FACTS**

10.     At least one association member ("Member Tester") has physical impairments and due to these impairments he has learned to successfully operate a wheelchair for mobility.  Said physical impairments substantially limit one or more of the following major life activities including but not limited to: walking.  Member is unable to walk any distance.  Member also has weakness in upper limb range of motion and has reduced dexterity of his hands.

11.     When Plaintiff Association tested Defendants' facilities it discovered that its members would be denied equal access to and would have  difficulty using the rental housing' facilities since Defendants' facilities failed to comply the Housing Accessibility Guidelines -  American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as "ANSI A117.1". Defendants failed to remove policy, service, program or physical barriers to equal access within their housing facilities.  The examples listed below of known barriers to equal access are not an exhaustive list of the barriers to equal access that relate to his disabilities that exist at Defendants' facilities.

12.     Plaintiff Club diverted its time and resources because of service, policy, program and physical barriers at Defendants' property. Club personnel conducted a detailed Internet search to determine if Defendants have large print, Braille, deaf interpreter, therapy animal and access structural changes to unit at cost of tenant policies. Further, personnel called to inquire as to these policies. Moreover, the Club retained contractors to investigate said policies, to survey the property, to photograph the property, to investigate when the property was constructed, to investigate the property ownership and to have an access report prepared. All the above diverted the Club's time and resources. Club staff investigated Defendants' Internet presence. See

7

Exhibit A. Also, the Club investigated Defendants' written material such as brochures, rental applications and leases. See Exhibit B. Moreover, the Club made an oral investigation to ascertain Defendants' companion animal, deaf interpreter and unit retrofitting policies. See Exhibit B. The Club retained a physical access consultant to survey Defendants' facility. The findings are attached as Exhibit B. The said exhibit details all the physical access violations and said violations are hereby alleged herein by reference. The facility was remodeled after 2011.

13.    Plaintiffs and Plaintiff Association can prove these barriers exist since Plaintiffs confirmed the access barriers at Defendants' facility. Plaintiffs specifically allege that Defendants knew, to a substantial certainty, that the policy, service, program and architectural barriers precluded wheelchair access. First, Plaintiffs and Plaintiff Association will prove that Defendants had actual knowledge that the architectural barriers precluded access.

14.    Second, due to the abundance of disability rights information and constant news coverage of disability discrimination lawsuits, Defendants had actual knowledge of the state disability laws and access requirements and decided deliberately not to remove policy, service, program and architectural barriers. Plaintiffs and Plaintiff Association allege any alternative methods preclude integration of wheelchair patrons, as it requires them to use second-class facilities. Also, expert testimony will show the facility contained inaccessible features.

15.    Plaintiffs and specifically at least one association member intend to return to Defendants' housing facilities in the immediate future to use their goods and services.  At least one association member frequently goes in the vicinity of Defendant's facility.  Plaintiffs and specifically at least one association member intends to return to Defendants' housing facilities in the immediate future and at the conclusion of this case to utilize their goods and services.

8

COMPLAINT
CASE #

16.     Pursuant to state law and federal housing access requirements, Defendants are required to remove barriers to their existing facilities.  Further, Defendants had actual knowledge of their access barrier removal duties under the state disability laws.  Also, Defendants should have known that individuals with disabilities are not required to give notice to a governmental agency before filing suit alleging Defendants failed to remove service, policy, program and architectural barriers to access.

17.     Plaintiffs and Plaintiff Association believes and herein alleges Defendants' facilities have access violations not directly experienced by Plaintiff Association but are related to his disability that would preclude or limit equal access by Member Tester, potentially including but not limited to violations of the housing and Title 24 of the California Building Code.

18.     Based on these facts, Plaintiffs and Plaintiff Association alleges he was discriminated against each time he patronized Defendants' facilities.

## NOTICE

19.     Plaintiffs and Plaintiff Association are not required to provide notice to the defendants prior to filing a complaint.   Skaff v Meridien N. Am. Beverly Hills, LLC, 506 F.3d 832 (9th Cir. 2007), see also, Botosan v. Paul McNally Realty, 216 F.3d 827, 832 (9th Cir 2000).

## WHAT CLAIMS PLAINTIFFS ARE ALLEGING AGAINST EACH NAMED DEFENDANT

20.     IMT CAPITAL II BEVERLY ARNAZ LLC and Does 1 through 10 will be referred to collectively hereinafter as "Defendants."

21.     Plaintiffs aver that the Defendants are liable for the following claims as

9

alleged below:

## DISCRIMINATORY PRACTICES

FIRST CAUSE OF ACTION AGAINST DEFENDANTS: **Violation Of Fair Housing Laws**

CLAIM I: **Violation of the US Fair Housing Act**

22.    Based on information, belief, and the facts stated elsewhere herein, Defendants have violated the United States Fair Housing Act and Amendments of 1988 (42 U.S.C. §§ 3600, et. seq)  as to Defendants' common area facilities and as to Defendants housing and rental policies. It is alleged Defendants: made, printed, or published, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the rental of a dwelling that discrimination based on handicap; discriminated in the rental, or to otherwise make unavailable or deny, a dwelling to any renter because of a handicap of—(A) that renter, (B) a person residing in or intending to reside in that dwelling after it is so rented, or made available; or (C) any person associated with that renter; discriminated against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—(A) that person; or (B) a person residing in or intending to reside in that dwelling after it is so rented, or made available; or  (C) any person associated with that person; discriminated by—(A) a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed

10

before the modification, reasonable wear and tear excepted; (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. The FHA was passed in 1968 then amended in 1988 before the Internet was widely used. Now landlords publish notices on the Internet. The investigator downloaded all such notices and reviewed them. There is a FHA notice at the apartments but the notice does not include anything about disability or reasonable modification or a reasonable accommodation. The rental application is online. Also, there is a dowloadable application without any disability FHA notice. Moreover, the application is not in large print. Finally, the application covers pets but does not cover companion or service animals.

23.    The Fair Housing Accessibility Guidelines provide housing design and construction guidelines. Federal Register on June 15, 1990 (55 FR 24730).  The final Guidelines provide that covered multifamily dwellings with elevators shall be designed and constructed to provide at least one accessible entrance on an accessible route regardless of terrain or unusual characteristics of the facility.   Every dwelling unit on a floor served by an elevator must be on an accessible route, and must be made accessible in accordance with the Act's requirements for covered dwelling units.

24.    For covered multifamily dwellings without elevators, the final Guidelines provide two alternative tests for determining site impracticality due to terrain. The first test is an individual building test which involves a two-step process: measurement of the slope of the undisturbed site between the planned entrance and all vehicular or pedestrian arrival points; and measurement of the slope of the planned finished grade between the entrance and all vehicular or pedestrian arrival points. The second test is a site analysis test which involves an analysis of the

11

existing natural terrain (before grading) by topographic survey with 2 foot contour intervals, with slope determination made between each successive contour interval.

25.     A site with a single building (without an elevator), having a common entrance for all units, may be analyzed only under the first test -- the individual building test. All other sites, including a site with a single building having multiple entrances serving either individual dwelling units or clusters of dwelling units, may be analyzed either under the first test or the second test. For sites for which either test is applicable (that is, all sites other than a site with a single non-elevator building having a common entrance for all units), the final Guidelines provide that regardless of which test is utilized by a builder or developer, at least 20% of the total ground floor units in non-elevator buildings, on any site, must comply with the Act's accessibility requirements.

26.     An accessible route into and through covered dwelling units. The final Guidelines distinguish between (i) single-story dwelling units, and (ii) multistory dwelling units in elevator buildings, and provide guidance on designing an accessible entrance into and through each of these two types of dwelling units.

Single-story dwelling units. For single-story dwelling units, the final Guidelines specify the same design specifications as presented in the proposed Option One guidelines, except that design features within the single-story dwelling unit, such as a loft or a sunken living room, are exempt from the access specifications, subject to certain requirements. Lofts are exempt provided that all other space within the unit is on an accessible route. Sunken or raised functional areas, such as a sunken living room, are also exempt from access specifications, provided that such areas do not interrupt the accessible route through the remainder of the unit. However, split-level entries or areas will need ramps or other means of providing an accessible route.

12

27.     Multistory dwelling units in buildings with elevators. For multistory dwelling units in buildings with elevators, the final Guidelines specify that only the story served by the building elevator must comply with the accessible features for dwelling units required by the Fair Housing Act. The other stories of the multistory dwelling unit are exempt from access specifications, provided that the story of the unit that is served by the building elevator (1) is the primary entry to the unit; (2) complies with Requirements 2 through 7 with respect to the rooms located on the entry/accessible level; and (3) contains a bathroom or powder room which complies with Requirement 7.

28.     Thresholds at patio, deck or balcony doors. The final Guidelines provide that exterior deck, patio, or balcony surfaces should be no more than 1/2 inch below the floor level of the interior of the dwelling unit, unless they are constructed of impervious materials such as concrete, brick or flagstone, in which case the surface should be no more than 4 inches below the floor level of the interior dwelling unit, unless the local building code requires a lower drop. This provision and the following provision were included in order to minimize the possibility of interior water damage when exterior surfaces are constructed of impervious materials.

Outside surface at entry door. The final Guidelines also provide that at the primary entry door to a dwelling units with direct exterior access, outside landing surfaces constructed of impervious materials such as concrete, brick, or flagstone should be no more than 1/2 inch below the interior of the dwelling unit. The Guidelines further provide that the finished surface of this area, located immediately outside the entry door, may be sloped for drainage, but the sloping may be no more than 1/8 inch per foot.

29.     Usable bathrooms. The final Guidelines provide two alternative sets of

13

specifications for making bathrooms accessible in accordance with the Act's requirements. The Act requires that an accessible or "usable" bathroom is one which provides sufficient space for an individual in a wheelchair to maneuver about. The two sets of specifications provide different approaches as to how compliance with this maneuvering space requirement may be achieved.

The final Guidelines for usable bathrooms also provide that the usable bathroom specifications (either set of specifications) are applicable to powder rooms (i.e., a room with only a toilet and a sink) when the powder room is the only toilet facility on the accessible level of a covered multistory dwelling unit.

30.    Accessible and usable public and common use areas. Doors within individual dwelling units. The final Guidelines recommend that doors intended for user passage within individual dwelling units have a clear opening of at least 32 inches nominal width when the door is open 90 degrees.

31.    Doors to public and common use areas. The final Guidelines continued to provide that on accessible routes in public and common use areas, and for primary entry doors to covered units, doors that comply with ANSI 4.13 meet the Act's requirement for "usable" doors.

32.    Thresholds at exterior doors. Subject to the exceptions for thresholds and changes in level at exterior areas constructed of impervious materials, the final Guidelines continue to specify that thresholds at exterior doors, including sliding door tracks, be no higher than 3/4 inch.

33.    Reinforced walls for grab bars. The final Guidelines for bathroom wall reinforcement remains essentially unchanged from the Option One guidelines. The only change made to these guidelines has been to subject powder rooms to the reinforced wall requirement when the powder room is the only toilet facility on the accessible floor of a covered multistory dwelling unit.

14

34.     Statutory and Regulatory Background: Title VIII of the Civil Rights Act of 1968 makes it unlawful to discriminate in any aspect relating to the sale, rental or financing of dwellings, or in the provision of brokerage services or facilities in connection with the sale or rental of a dwelling, because of race, color, religion, sex or national origin. The Fair Housing Amendments Act of 1988 (Pub.L. 100-430, approved September 13, 1988) (Fair Housing Act or the Act) expanded coverage of Title VIII (42 U.S.C. 3601-3620) to prohibit discriminatory housing practices based on handicap and familial status. As amended, Section 804(f)(3)(C) of the Act provides that unlawful discrimination includes a failure to design and construct covered multifamily dwellings for first occupancy after March 13, 1991 (30 months after the date of enactment) in accordance with certain accessibility requirements. The Act defines "covered multifamily dwellings" as "(a) buildings consisting of 4 or more units if such buildings have one or more elevators; and (b) ground floor units in other buildings consisting of 4 or more units" (42 U.S.C. 3604). The Act makes it unlawful to fail to design and construct covered multifamily dwellings so that: public use and common use portions of the dwellings are readily accessible to and usable by persons with handicaps; all doors within such dwellings which are designed to allow passage into and within the premises are sufficiently wide to allow passage by persons in wheelchairs; and all premises within such dwellings contain the following features of adaptive design: an accessible route into and through the dwelling; light switches, electrical outlets, thermostats, and other environmental controls in accessible locations. reinforcements in bathroom walls to allow later installation of grab bars; and usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

35.     The Act provides that compliance with (1) the appropriate requirements of the American National Standard for Buildings and Facilities--Providing Accessibility

COMPLAINT
CASE #

and Usability for Physically Handicapped People (commonly cited as "ANSI A117.1"), or (2) with the laws of a State or unit of general local government, that has incorporated into such laws the accessibility requirements of the Act, shall be deemed to satisfy the accessibility requirements of the Act. (See Section 804(f)(4) and (5)(A).) The Act also provides that the Secretary of the Department of Housing and Urban Development shall provide technical assistance to States and units of local government and other persons to implement the accessibility requirements of the Act. (See Section 804(f)(5)(C).)

36.     Congress believed that the accessibility provisions of the Act would facilitate the ability of persons with handicaps to enjoy full use of their homes without imposing unreasonable requirements on homebuilders, landlords and non-handicapped tenants;

be essential for equal access and to avoid future de facto exclusion of persons with handicaps; and

be easy to incorporate in housing design and construction.

37.     Congress predicted that compliance with these minimal accessibility design and construction standards would eliminate many of the barriers which discriminate against persons with disabilities in their attempts to obtain equal housing opportunities. (See H.R. Rep. No. 711, 100th Cong. 2d Sess. 27-28 (1988) ("House Report").)

38.     The Fair Housing Act became effective on March 12, 1989. The Department implemented the Act by a final rule published January 23, 1989 (54 FR 3232), and which became effective on March 12, 1989. Section 100.205 of that rule incorporates the Act's design and construction requirements, including the requirement that multifamily dwellings for first occupancy after March 13, 1991 be designed and constructed in accordance with the Act's accessibility requirements. The final rule

16

clarified which multifamily dwellings are subject to the Act's requirements. Section 100.205 provides, in paragraph (a), that covered multifamily dwellings shall be deemed to be designed and constructed for first occupancy on or before March 13, 1991, if they are occupied by that date, or if the last building permit or renewal thereof for the covered multifamily dwellings is issued by a State, County or local government on or before January 13, 1990. The Department selected the date of January 13, 1990 because it is fourteen months before March 13, 1991. Based on data contained in the Marshall Valuation Service, the Department found that fourteen months represented a reasonable median construction time for multifamily housing projects of all sizes. The Department chose the issuance of a building permit as the appropriate point in the building process because such permits are issued in writing by governmental authorities. The issuance of a building permit has the advantage of being a clear and objective standard. In addition, any project that actually achieves first occupancy before March 13, 1991 will be judged to have met this standard even if the last building permit or renewal thereof was issued after January 13, 1990 (55 FR 3251).

39.     Section 100.205 of the final rule also incorporates the Act's provisions that compliance with the appropriate requirements of ANSI A117.1, or with State or local laws that have incorporated the Act's accessibility requirements, suffices to satisfy the accessibility requirements of the Act as codified in ?100.205. In the preamble to the final rule, the Department stated that it would provide more specific guidance on the Act's accessibility requirements in a notice of proposed guidelines that would provide a reasonable period for public comment on the guidelines.

40.     Defendants failed to make the common areas where residents and non-residents traverse accessible as required. Also, Defendants failed to provide the required reasonable accommodations provided to prospective tenants in light of the

17

physical access problems. At least one association member personally experienced the failure to provide the required access and he also experienced the failure to provide reasonable accommodations near the rental offices and common areas, and he also did not see any reasonable accommodations notices near the rental offices. The federal Fair Housing Act of 1988 requires owners of housing facilities and others to make reasonable exceptions in their policies and operations to afford people with disabilities equal housing opportunities. The Act requires that multifamily housing with four or more units be designed and built to allow access for persons with disabilities. This includes accessible common use areas, doors that are wide enough for wheelchairs, kitchens and bathrooms that allow a person using a wheelchair to maneuver, and other adaptable features within the units.

41.   Based on information, belief, and the facts stated above, Plaintiff alleges that Defendants in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after the date of enactment of the Federal Fair Housing Amendments Act of 1988 (42 U.S.C. §§ 3600, et. seq), failed to design and construct those dwelling in such a manner that-- (i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons; (ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and (iii) all premises within such dwellings contain the following features of adaptive design: (I) an accessible route into and through the dwelling; (II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;  (III) reinforcements in bathroom walls to allow later installation of grab bars; and (IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space in violation of 42 U.S.C. § 3604.  Based on information, belief and the facts stated

18

above, Plaintiff also alleges that Defendants refused to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford such person equal opportunity to use and enjoy a dwelling in violation of 42 U.S.C. § 3604.

42.     Based on information, belief and the facts stated above, Plaintiff also alleges that Defendants refusal to make the required reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford such aggrieved person equal opportunity to use and enjoy a dwelling in violation of 42 U.S.C. § 3604.  Plaintiffs and at least one association member also allege that Defendants' failure to design and construct as required and Defendants refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford Plaintiffs and at least one association member or other similarly situated persons with disabilities with an equal opportunity to use and enjoy a dwelling cause a prohibited disparate discriminatory impact on Plaintiffs and at least one association member and others similarly situated.  Wherefore, Plaintiffs and at least one association member prays for relief as hereinafter stated.

CLAIM II: **Violation of California Fair Housing Act**

43.     Defendants' apartments were constructed in 1980 as new construction under the 1979 ANSI. Thus, the primary entrance violated ANSI when it was built. Further, the apartments were remodeled in 2011 in violation of Title 24 or ANSI, whichever provides greater protection. See Exhibit B. Based on information, belief and the facts stated above, Plaintiffs allege that Defendants violated the California Fair Employment and Housing Act.  Based on information, belief and the facts stated above, Plaintiffs allege that Defendants failed to design and construct a covered

COMPLAINT
CASE #

multifamily dwelling in a manner that allows access to and use by disabled persons by providing, at a minimum, the following features in violation of California Government Code, Title 2, §12955.1: (1) All covered multifamily dwellings shall have at least one building entrance on an accessible route, unless it is impracticable to do so because of the terrain or unusual characteristics of the site. The burden of establishing impracticability because of terrain or unusual site characteristics is on the person or persons who designed or constructed the housing facility. (2) All covered multifamily dwellings with a building entrance on an accessible route shall be designed and constructed in a manner that complies with all of the following: (A) The public and common areas are readily accessible to and usable by persons with disabilities. (B) All the doors designed to allow passage into and within all premises are sufficiently wide to allow passage by persons that use mobility devices.  (C) All premises within covered multifamily dwelling units contain the following features of adaptable design: (i) An accessible route into and through the covered dwelling unit. (ii) Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations. (iii) Reinforcements in bathroom walls to allow later installation of grab bars around the toilet, tub, shower stall, and shower seat, where those facilities are provided. (iv) Usable kitchens and bathrooms so that an individual in a wheelchair can maneuver about the space.  Defendants failed to design and construct 10 percent of the multistory dwelling units in buildings without an elevator that consist of at least four condominium dwelling units or at least three rental apartment dwelling units in a manner that incorporates an accessible route to the primary entry level entrance and that meets the requirements of paragraph (2) of subdivision (a) with respect to the ground floor, at least one bathroom on the primary entry level and the public and common areas. Any fraction thereof shall be rounded up to the next whole number.

20

COMPLAINT
CASE #

44.   Based on information, belief and the facts stated above, Plaintiffs and at least one association member alleges that Defendants refused to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling in violation of CA Government Code 12925.

45.   Wherefore, Plaintiffs prays for damages and relief as hereinafter stated.

46.   WHEREFORE, Plaintiffs pray for judgment and relief as hereinafter set forth.

## DEMAND FOR JUDGMENT FOR RELIEF:

A.   The Plaintiff Association is seeking organizational damages;

B.   The Plaintiff Association seeks compensatory damages pursuant to 42 U.S.C. 3613(c);

C.   All Plaintiffs seek injunctive relief pursuant to 42 U.S.C. 3613(c).  Plaintiffs request this Court enjoin Defendants to remove all architectural and communication barriers in, at, or on their facilities including without limitation violations of 42 U.S.C 3601.l

D.   For attorneys fees pursuant to  42 U.S.C. 3613(c)(2), 42 U.S.C. § 1988;

E.   A Jury Trial and;

F.   For such other further relief as the court deems proper.


Respectfully submitted:


Dated:  October 15, 2015

LAW OFFICES OF DAVID C. WAKEFIELD

By:   /s/David C. Wakefield
DAVID C. WAKEFIELD, ESQ.
Attorney for Plaintiffs

21

COMPLAINT
CASE #